## Case No. 14,166.

TREFZ v. KNICKERBOCKER LIFE INS. CO.

[6 Ins. Law J. 850.] [1]

Circuit Court, D. New Jersey, 1877. [2]

INSURANCE — LIFE — APPLICATION — REPRESENTATIONS—"SICKNESS."

1. The application for a policy on the life of the husband in favor of the wife was in the singular number, but was signed by both. Held, that it was a joint agreement by both parties.

2. The application, which was for the issue of a new, in exchange for the old, policy, covenanted that all the statements in the original application were true when made, and should be the basis of the contract. The policy provided that it was issued in consideration of the representations in the application, upon the faith of which it was issued; also, that it was issued and accepted upon the express condition and agreement that, if any of the statements in the application were in any respect untrue, the policy should be void. Held,

[1] [Reprinted by permission.]
[2] [Affirmed in 104 U. S. 197.]
24FED.CAS.—12

that any false statement, whether material to the risk or not, avoids the policy. A jury has no right to say that it will not regard them because they are not material.

3. When the insured, who was a German, answered to one of the interrogatories in the application "never sick," which was written by the person who took the application, it was for the jury to decide, in view of conflicting testimony, and his important knowledge of English, whether the answer was false.

4. If the sickness alleged by the company had been subsequently explained to the medical examiner upon its demand for a re-examination, in order to secure a reinstatement of the policy, and was by him regarded as too trivial to mention, the jury has a right to infer that it was not so serious as to make the statement of the insured a fatal mistake.

5. A party may not, in general, contradict the evidence of his own witness, unless such evidence was a surprise.

6. It is not every affectation of the head from the sun that constitutes "sickness," within the proper significance of that term. The burden of proof is on the defendant alleging such sickness.

7. A jury may not consider the hardship of the case in determining the liability of the company.

At law.

Mr. Coult, for plaintiff.
Mr. Keasbey, for defendant.

NIXON, District Judge (charging jury). The case has been so ably summed up by the counsel of the parties that not much remains for me to say. You are to determine all questions of fact. The responsibility of the law rests with the court. This is an action brought by the widow of Christolph Trefz to recover the amount alleged to be due on two policies of life insurance, which she held in the defendant's company, upon the life of her husband. They were both dated September 6, 1873; one for $8,500, and the other for $2,500. An examination of the face of the papers shows that they were issued to the plaintiff, by the company, in consideration of her paying an annual premium, in advance, of $461.64 on the policy for $8,500, and $125.78 on the policy for $2,500. It is acknowledged by the terms of the respective policies that these sums were paid for the first year, ending September 6, 1874. The company issued and delivered to the insured, yearly thereafter, what are called "renewal receipts," signed by the secretary and president, certifying that the policies had been continued in force for another year, and I regard the production of these receipts by the insured as prima facie evidence, at least, that the annual premiums have been since regularly paid.

The evidence is undisputed that Christolph Trefz died on the 24th of February, 1876, and that his widow filed with the company proofs of loss on the 10th day of March following. By the terms of the policies the company was obliged to pay the amounts due upon them three months after notice and satisfactory proofs of the death of the insured. As no objection appears to have been made to the form of the proof, the jury

will assume that the notice was regular, and was accepted by the company; and hence, if any liability exists, the sums due to the plaintiff upon the policies should have been paid to her on the 10th day of June, 1876. The plaintiff states, in her testimony, that when she presented to the company the proofs of death and loss, one of the officers interposed some objections to payment, on the ground that the deceased had shortened his life by the excessive use of intoxicating liquors, and that it might be a proper case for compromise; but that no difficulty was stated in regard to the form or mode of proofs.

The policies on which the suit has been brought were not the only or the first policies that the company had issued to the plaintiff. It appears in evidence that on the 25th day of May, 1867, the policy was issued for $3,000, and on the 18th day of March, 1868, another was issued for $10,000, making the aggregate of $13,000, which the insured had in the company from 1867–68 to 1873, when the surrender took place, and the new policies were made out. The first policies were surrendered on the 30th day of August, 1873, and on that day it appears that a written agreement was entered into between the parties, setting forth the terms and conditions upon which the new policies were to be granted. These agreements are in evidence, and they seem to be a request from the insured and his wife to the company to issue new policies, and were in these words:

"The undersigned, owner of policy No. 16,772 on the life of Christolph Trefz, hereby requests the Knickerbocker Life Insurance Company of New York to issue a new policy for $2,500, with premiums payable annually; and, in consideration thereof, I do hereby covenant and agree that all the statements contained in the original application and declaration for the said policy were true and valid when made, and are hereby made the basis of the contract between myself and the said company for the new policy hereby solicited." The other agreement is the same in form, and asks for a new policy for $8,500. Although in the singular number, they are signed by both Christina Trefz and her husband, and therefore must be held to be a joint and several agreement on their part that all the statements in the applications for the first policy were true and valid when made, and these statements were considered by them as the basis of the contract between the parties for the new policies about to be issued. The jury will thus perceive the connection between the old and the new policies,—the written statement and applications for the former were made the basis of the contract between the parties for the latter.

Now, turning to the latter policies, we find that they both purport to be issued upon the life of Christolph Trefz for the benefit of his wife, Christina, "in consideration of the representations made to them in the ap-

plication for this policy, and upon the faith of which the same is issued," etc. The reference here is not to representations made in any new applications, but to the representations and statements in the original application, which had been made, by the agreement of the parties, the basis of the contract on which the new policies were issued. Looking further into the terms of these policies, we find the following condition annexed to them, and its importance will be understood by the jury when I state that the whole case, in my judgment, turns upon its meaning: "This policy is issued, and is accepted by the assured, upon the following express conditions and agreements, to wit" (and here follows a long statement of conditions and agreements, to which it is not necessary to refer, as they have nothing to do with the present controversy, and concluding with the following): "That if any of the statements or declarations made in or accompanying the application for this policy, and upon the faith of which the same is issued, shall be found to be in any respect untrue, then in every such case this policy shall be null and void." Now, gentlemen, that seems to be a hard condition for the policy holder, but it is there, and courts and juries, in cases of this sort, are obliged to ascertain what the contract is, and enforce it, without reference to the parties concerned in the litigation; in other words, there is no place for sympathy. We are not to inquire whether one party or the other made a good or bad bargain, nor are we to set up our individual judgments upon the question whether it was wise or unwise for one or the other to conclude such a contract. We are simply to find out what the parties did agree to, and whether either has failed to perform his covenant. When the surrender of the old policies took place, the parties agreed in express terms to make the statements and declarations in the original application the basis of the contract for the new policies.

We have heard a good deal said, during the trial, on the question whether these statements and declarations should be treated as express warranties, or as mere representations; but under the decisions of the supreme court of the United States (Jeffries v. Life Ins. Co., 22 Wall. [89 U. S.] 47, and Aetna Ins. Co. v. France [91 U. S.] 510), which control this court in the interpretation of the law, it would not seem to make any practical difference in this suit whether they are regarded as warranties or representations. Whether the one or the other, if they are in any respect untrue, they avoid the contract, and prevent a recovery upon the policies. The jury will at once perceive the reason of this. It is because the parties themselves have agreed that such shall be the result of any untruth in the statements. Nor, let it be observed in this connection, does it matter whether the false statements

or the false representations, if any have been made, are in my judgment material to the risk or not. The company has determined the materiality of the matter by asking the question. This may seem harsh, but we are not considering that. It is the law of this court that, when a party goes to a life insurance company for the purpose of effecting a life insurance, and agrees that every statement which he makes to the company shall be true, or there shall be no contract between them, if it turns out afterward that the statements were false or untrue, the jury have no right to say that they will not regard them, because they were not material to the risk. The company, in propounding the inquiry, made themselves the judges of its materiality, and the individual, in answering falsely, agreed that he should have no benefit under the policy or the contract.

We have now reached the question on which the case turns. Has it been proved to your satisfaction, by the defendant corporation, that the insured, in his written application, made any statement or representation which was not in fact and in all respects true? The jury must determine this question from the evidence in the case. The counsel for the defendant insists that the application, when considered in connection with the testimony of the witnesses, shows upon its face that there was an untrue statement made; but the difficulty about it is that there is a conflict in regard to the evidence, and the jury must first ascertain what the evidence is, before the question of the falsity of the statement can be passed upon.

I hold in my hand one of the written applications of Christolph Trefz and wife for one of the policies of insurance. The other is substantially like it, although in the German language. These are the papers that the parties stipulated should be true, and the basis of the contract between them, when the policies were issued on which the suit was brought, and, if the statements and declarations therein contained are not true, there was no contract to be enforced.

The counsel of the defendant claims that the answer given to the fifth interrogatory is an untrue answer, and must be so regarded by the jury when they come to construe the testimony in regard to the physical condition of the insured before the application was made. The interrogatory was this: "Fifth. Whether, now or formerly, when, or how long, or to what degree, have you been subject to, or at all affected by, any of the following diseases?" And then comes a long enumeration of diseases, commencing with A (apoplexy), in the alphabet, and ending with Y (yellow fever). He was asked whether he had ever been afflicted with any of these diseases. He replied "No" in one of the applications, and in the other the answer was "Never sick"; not written, however, by himself, but by the person who took his application for the insurance.

The counsel for the defendant asked me to charge you that the individual before whom the application was taken was not shown to be the agent of the company. I will say, in reply, that Mrs. Trefz testified that he represented himself to be such agent, but that, standing alone, would not bind the company. I do not know whether he was their authorized agent or not, and I have no recollection of any testimony in the case which would tend to make them in any wise responsible for his acts.

The counsel for the defendant further says that the reply "never sick" was an untruth of such a character as to avoid the policy. In considering this you have the right, and you ought to remember that the applicant was not a native born citizen, and that he was not very familiar with the language in which the question was put. He did not speak it with any fluency, and it is fair to assume from the testimony that he did not understand it very fully when spoken to him. I make these observations because it seems to me that, in endeavoring to ascertain the truth or falsity of the answer, we ought to look at it in the light of the knowledge and understanding which the individual had in regard to the terms he uses. The question was stated in what to him was a foreign language: "Have you such and such diseases,"—beginning with apoplexy and ending with yellow fever. His reply is reported in the same language, "No; never sick." Was the answer false? This much certainly is true, in view of the testimony of Dr. Smith, Dr. O'Gorman, the plaintiff, and others, that throughout the insured's life he had been a uniformly healthy man. They said they had never known him to be sick. He was not subject to the ills to which people in ordinary life are subject, in the way of acute or bad sickness. But it is also true that, before the applications were filed,—about six months before, if you believe the inference of the witness Schempler, who inferred that it was in the summer of 1866, from the statements made by Trefz at the time of his re-examination,—he was exposed to the rays of the sun whilst at work in the field, and was overcome by the heat in such a manner, and to such an extent, that he left his work, and went to his house. The defendant insists that such a fact was sufficient to make void the policies, because it shows that a man could not truly say he was never sick who had suffered from such a sunstroke.

Now, gentlemen, you must decide this question fairly, carefully adverting to all the testimony on the subject. The first witness to whom you will turn (Schempler) was for several years the bookkeeper of the insured. He was offered by the defendant necessarily, I suppose, because it was difficult to get testimony in matters of this nature without calling on the persons who have been intimately associated or connected in business with people affected in this way. I think it is proper

for me to observe that Mr. Schempler produced upon the court the impression of desiring to speak the truth. He was not prejudiced in favor of the company, although they called him, and I did not see any disposition on his part—although you must be the judge of that—to make any statements merely to favor the plaintiff. He says that the first he ever heard anything about a sunstroke was about the year 1872. He is not sure of the year, however, but it was at the time when he had neglected to pay the premiums due upon the policies, and had gone to the company's office in New York, with Mr. Trefz, to apologize for his carelessness, and to pay the premiums. Dr. Derby, the medical examiner of the company, says that it was in March, 1871, and fixes the date by a memorandum made at the time. The officers refused to renew the policy without a new examination of the insured. They were sent to the medical examiner of the company, and the doctor asked the witness whether he had any knowledge of Mr. Trefz's ever having a sunstroke. He thinks the doctor was led to ask him such a question from seeing some peculiar movements about the arms of the insured, and that the inquiry was made of him because he was more familiar with the English language than Mr. Trefz. The witness had never heard that Mr. Trefz had ever been thus affected, but, on inquiring of him, he learned that he had had a sunstroke some time before. He fully described to the medical examiner the symptoms, explained how he had been affected; and when he had concluded, the doctor, who was doubtless the agent of the company in the examination, said: "Oh, that makes no difference, if that is all;" and passed him as a fit subject for insurance after the attack had been described and explained.

When this testimony was given, I presume every gentleman upon the jury at once came to the conclusion that if it was true, and if the agent of the company regarded the attack, when he was told of it, of too little consequence to hinder the renewal of the forfeited policies, it was now too late for them to come forward, and say that it was of so serious a character and nature that he ought never to have been insured at all; in other words, that the company ought not to be allowed to regard the indisposition of such a trivial character as to overlook it, and take the money of the insured for a renewal of the policies, and, after his death, to avoid the payment of the loss, on the ground that the attack was serious enough to bring it within the range of the diseases respecting which the insured gave the reply of "never sick." But is it true that this statement and explanation were made by Mr. Trefz to the examiner? I called the attention of the counsel, when he was summing up the case for the defendant, to the fact that, when the doctor was afterwards called as a witness, he did not, in direct terms, contradict the testimony of Schempler. His reply was that the law did not allow him to offer a contradiction to his own witness. This is undoubtedly the general principle, for the obvious reason that, where a party tenders a witness in a cause, he by that act assumes that he is worthy of belief; and it would not conduce to the ends of justice to allow such a party to select those portions of his evidence that are favorable to him, and ask the jury to rely upon its truth, and then prove that he should not be believed as to other portions that seem to make against his case. But where the testimony of the witness has surprised the party offering him, there are cases in which the law allows of his contradiction. Whether this was one of such cases it is not necessary for me to say; but I think the defendant should have called the attention of the examiner to the interview between himself and the insured, and should have been asked whether the witness had stated the whole truth in regard to the conversation between them, and left the counsel of the plaintiff to have made objections if he saw fit. But, although no attempt at direct contradiction was made, the witness was asked a number of questions, the drift of which was to create the impression that no such conversation took place. He stated, for instance, without qualification, that, if he had known about the sunstroke as he then understood it, he would not have recommended the renewal of the policies of insurance.

It is for the jury to decide, in this state of the proof, where the truth lies. In determining it, they must not lose sight of the fact that the defendant claims that the assured stated that he had received a sunstroke, and that his conduct in talking about it, and in putting cabbage leaves in his hat, etc., indicated his apprehension of a return of the trouble. They must also determine whether it is probable that the insured would have pursued this course of conduct if he had considered the attack of so alarming a character as to make his declaration that he was "never sick" an untruth, which would defeat his policies of insurance. You must also bear in mind the statement of the witness Schempler that the insured said to the doctor that he was rendered insensible by the sunstroke. Consider, in connection with this, the testimony of the plaintiff, Mrs. Trefz, who stated that her husband came home alone; that he did not seem to be seriously affected; that he said he had been affected; that his head had been hurt by the heat; that he had been compelled to stop work, and come home; that at first he declined to eat his dinner; and that he did eat afterwards, and returned to his business. All this is only material as conveying to you a knowledge of the extent of the injury received by him. It is not every affection of the head from the heat of the sun that con-

stitutes sickness. When a man says that he was never sick, he does not mean that he never had a headache, or that he was never affected by the heat of the sun, or that he never had any of the ills that flesh is heir to. It may have been meant, in the present case, that the insured had "never been sick" with any of the long list of diseases which had just been enumerated to him.

I think I may properly say to the jury that there are affections of the head, caused by the heat of the sun, that may be denominated sickness, and that there may be other affections of the head thus caused which are not sickness. It is for you to determine the extent of the injury received by Mr. Trefz; and whether it was of such a character or nature as to make his reply to the interrogatory a falsehood or not.

The question was put to Dr. O'Gorman by the defendant's counsel, as to what he considered a sunstroke, and his reply was that he regarded it rather an accident than a disease. What I suppose is true to the matter is that there are some affections of the head, brought on by exposure to the sun, which would make the reply of the insured an untruth; and that there are other affections, produced in the same way, of such a light character as to render his reply proper and fair. It is for the jury to say from the evidence, in regard to the extent, nature, and kind of sickness, whether the attack which the insured suffered was of the character to make his answer "never sick" a falsehood.

The burden of proof here is upon the defendant. The company sets up the defense, and the jury must be satisfied from the evidence that the untruth of the statement has been established; otherwise, their verdict should be for the plaintiff, for the amount due on the two policies, with interest commencing three months after filing the proof of death and loss. But if you believe from the testimony that the insured, whether willfully or otherwise, made a statement in his application which amounted to an untruth, it will not do to refuse to enforce the contract which the wife and husband entered into, on the ground that it would be a hardship to the widow. People must not make bad bargains outside of the court room, and then come here, expecting the court and jury will relieve them from the consequences; but you must be satisfied of the falsity of the statement made by the insured before you can find a verdict for the defendant.

I will now refer to the request of the counsel of the defendant to make certain charges in regard to the law of the case. I will read them, and then state what I charge in regard to them.

I am requested to charge:

(1) That the statements contained in the original application and declaration for the respective policies, in place of which the policies in suit were issued, enter into and form a part of the new policies; and, if any of the statements contained in either of the said applications are found in any respect untrue, the policy issued upon the application containing such untrue statement is void, and the plaintiff cannot recover thereon. That I have already charged in substance, and I repeat it.

(2) That, although the policies do not, in express terms, make the application a part of the policy, yet, inasmuch as they declare that they are issued in consideration of the representations made in such applications, and on the faith of the same, and upon the express condition that, if any of the statements made therein were in any respect untrue, the policies should be void, these stipulations make the truth of the facts a matter of contract, obligatory on the part of the insured, as if the statement had been embodied in the policy itself; and therefore the contract must be held to comprehend both the policies and the application which they refer to as their basis. I do not perceive that the second differs materially from the first, except in the phraseology, and I charge it to be the law of this case.

(3) That being so referred to in the policies, and made in the basis of the contract, the statements in the application were warranties; and, if any of them, whether material to the risk or not, were untrue in any respect, either from design, mistake, or ignorance, the plaintiff cannot recover. I will pass that for the present. I think there is a request further down that covers the ground.

(4) That where the policy and application are brought together by the distinct reference of the former to the latter, in the terms employed in this case, there is an express agreement, not only that the statements are true, but they are to form a part of the contract, and thereby the statements become warranties. It is only where there is no such distinct identification of, and reference to, the application, that the statements can be held representations, and not warranties. I will pass that, also, for the present, as I think there is something further on in reference to it.

(5) That whether the statements are to be regarded as representations or warranties, or even as neither, yet, being expressly made the basis of the contract, they must all be true, as the insured has agreed that they shall be; and further, that the faithful performance of this agreement is essential to the existence of liability on the part of the company. I decline to charge to third and fourth requests, because I am not prepared to say that these representations are warranties, nor do I think it material to this case whether they are regarded as one or the other. This fifth request covers the whole ground, and I charge it. Whether the statements are treated as representations or warranties, or as either, they have been made expressly the basis of the contract, and must all be true, for the insured has agreed that

they shall be, and the faithful performance of the agreement is essential to the existence of liability on the part of the company. I hold that, if they are not true, the plaintiff cannot recover.

(6) That where it is expressly covenanted as a condition of liability that the statements in the application are true, and their truth forms the basis of the contract, and false answers are made, it is of no consequence whether the statements are material to the risk, or influence the mind of insurers, and these questions are not for the determination for the jury. I have already so said in my charge, and I repeat it.

(7) That, under the provisions of these policies, and the undisputed facts of the case, the only question for the jury is the truth or falsity of the answers; and that if the answer "never sick" was in point of fact untrue, the plaintiff cannot recover, whether the injury was material to the risk or not. I charge that, gentlemen, to be the law in this case.

(8) That by the undisputed medical evidence of the plaintiff's witnesses, sunstroke is a disease of the brain, often fatal, though sometimes entirely cured and its effects obliterated. I do not charge that, because it was not the undisputed medical testimony, as I understand it. I believe the question was put to Dr. O'Gorman whether it was not a disease, and he replied that he would rather call it an accident. I decline to charge it, because I do not consider it undisputed medical testimony.

(9) That if, within two or three years, the insured had such disease, his answer "never sick" was untrue, although he had entirely recovered from it long before his death, or even at the time of his application. I decline to charge, because I do not think it is true, as I have endeavored to state in my charge.

(10) That it is proved by witnesses, unimpeached and uncontradicted, that the insured frequently stated that he had had sunstroke in 1866, and guarded carefully against its recurrence, long after the insurance was effected; and that, unless you can find something in the case which renders these statements incredible, the jury are bound to treat the fact as established in the case, and, on the principles above asserted, to find for the defendant. I decline to charge that, because I do not care to interfere with questions of fact before the jury.

(11) That there is no evidence that the application—

By the counsel of the defendant: That has been already charged; the request may be omitted.

(12) If the jury believe the testimony of the witness J. H. Schempler, the defendant is entitled to a verdict in its favor. I decline to charge that, as I rather think his testimony, taken altogether, made for the plaintiff, rather than the defendant.

(13) If the answer of Trefz to any question was untrue in the sense in which such question and answer are commonly understood, the policy is void, even though the answer may have been true in the sense in which he understood the question. That will hardly do, and I decline to charge it.

By the counsel of the defendant: I desire to except to the ruling of the court to charge the last but one request, and to the terms of the refusal, to the effect that the testimony of Schempler is, on the whole, in favor of the plaintiff.

BY THE COURT: I did not mean to influence the judgment of anyone. I only stated that as my reason for declining to make the charge.

By the counsel of the defendant: I am afraid that it has done so.

BY THE COURT (to the jury): Anything I have said with regard to any fact in the case should not be allowed to influence your judgment. The facts are for you to determine. Although it may be proper, at times, for the court to impart to the jury the impression made upon its mind by the testimony, they are not bound by it. I repeat that you must not be influenced by any expressions I have used in regard to any questions of fact whatever.

By defendant's counsel: We except, of course, to the refusal of the court to charge as we requested, and to those parts of the charge in which the court said that Dr. Smith and other witnesses had testified that Mr. Trefz was a very healthy man in 1872, and for a long time after, inasmuch as the question of his health after he became acquainted with Dr. Smith and the other witnesses referred to was not the question at issue at all, but the state of his health in 1867 and 1868, and long before the policy.

BY THE COURT (to the jury): That exception is well taken, if I have so charged, and I will now correct it. Whatever Dr. Smith or others may have said in regard to the condition of the insured's health after 1872 should not affect your judgment; but in this same connection you should also weigh the statement of Mrs. Trefz that her husband was always a healthy man.

By defendant's counsel: Another special point of exception concerns the charge of Dr. Derby, as agent of the company, and the effect of the fact, if it was true, that he had been informed by Schempler and Trefz in regard to the sunstroke, and said it was a matter of no consequence. By our taking exceptions in this way, I presume it will be sufficient to cover the whole charge when we shall have it written out. On that subject, our claim, of course, is that Mr. Derby, as the physician of the company, could not interrupt the effect of the statement made years before, or waive the right of the company arising out of it. And, not only that, but this statement in 1871 could not abrogate the effect of a subsequent contract made in

1873, based upon the truth of former statements in 1871.

BY THE COURT: I am afraid that counsel did not fully understand what I said to the jury on that point. What I attempted to say was this: that, if it was true, as Schempler stated, that the insured revealed to the company's examiner. in 1871 or 1872, the full extent of sunstroke in 1866, and the company then thought that it was of so little consequence that it ought not to hinder the renewal of the policies, the jury have the right to infer that it was not of such consequence as to make the statement of the insured a fatal mistake.

By defendant's counsel: We except, then, to the charge in these terms. I did understand it substantially as stated now. I think this point covers all the exceptions.

The jury, after an absence of about one hour, returned into court with a verdict in favor of plaintiff in the sum of $11,998.82.

[On writ of error. the judgment entered upon this verdict was affirmed. 104 U. S. 197.]